**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

```
_____
                               :
In re:                         :
                               :
NICKELS MIDWAY PIER, L.L.C.,   :          Civil Action
                               :          No. 10-cv-141 (NLH)
              Debtor.          :
_____:          **OPINION**
                               :
NICKELS MIDWAY PIER, L.L.C.,   :
                               :
              Appellant,       :
                               :
         v.                    :
                               :
WILD WAVES, L.L.C.,            :
                               :
              Appellee.        :
_____:
```

<u>**APPEARANCES**</u>:

Alan C. Milstein, Esquire
Sherman, Silverstein, Kohl, Rose & Podolsky, P.C.
Fairway Corporate Center
4300 Haddonfield Road
Suite 311
Pennsauken, N.J. 08109
      and
Michael A. Zindler, Esquire
Teich Groh, P.C.
691 State Highway 33
Trenton, N.J. 08619
*Attorneys for Appellant Nickels Midway Pier, L.L.C.*

Arthur Joel Abramowitz, Esquire
Jerrold N. Poslusny, Jr., Esquire
Cozen O'Connor, P.C.
Liberty View, Suite 300
457 Haddonfield Road
Cherry Hill, N.J. 08002
      and
Willis F. Flower, Esquire
Ford, Flower & Hasbrouck
New Road & Central Avenue
Suite 42A
P.O. Box 405

Linwood, N.J. 08221
*Attorneys for Appellee Wild Waves, L.L.C.*

**HILLMAN, District Judge**

Appellant, Nickels Midway Pier, L.L.C. ("Nickels"), appeals the Bankruptcy Court's denial of its motion to compel appellee, Wild Waves, L.L.C., to pay full rent and real estate taxes on the premises that Wild Waves leases from Nickels pursuant to a lease agreement and to eliminate preexisting rent and tax abatements altogether.

For the reasons expressed below, the Bankruptcy Court's decision, set forth in its Oral Opinion articulated on November 9, 2009 and in its Written Order dated December 10, 2009, will be affirmed.[1]

**I.    JURISDICTION**

United States district courts have mandatory jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges.  28 U.S.C. S 158(a)(1).

---

[1] Pursuant to Federal Rule of Bankruptcy Procedure 8012, oral argument in a bankruptcy appeal shall be permitted in all cases unless the district judge deems it unnecessary.  Based on a review of the parties' briefs and the record, the Court finds that its decisional process would not be significantly aided by oral argument.  The Court notified the parties by Text Order dated January 14, 2010, that, unless otherwise ordered, no oral argument would be held in this appeal.  The parties have not objected to, or provided any reasons to alter, this Court's decision.

## II.  BACKGROUND[2]

Nickels owns boardwalk property in Wildwood, New Jersey, including an amusement pier that it operates.  In or around May 1999, Nickels and Wild Waves entered into a lease agreement in which Wild Waves would lease a substantial portion of the pier, whereupon it would construct and operate a water park.  Wild Waves maintained that, as part of their deal, Nickels agreed to sell the pier to Wild Waves.  Nickels disputed that assertion. In 2001, Nickels filed a suit against Wild Waves in the Superior Court of the State of New Jersey, seeking to evict Wild Waves and to collect rent due under the lease.  Wild Waves counterclaimed, arguing that Nickels was obligated to sell the pier pursuant to the parties' oral agreement of sale.  Ultimately, the Superior Court found that the parties had entered into an oral contract for sale of the pier.[3]

During the pendency of the state court litigation, fire ravaged Nickels' pier on two separate occasions, damaging the

_____

[2] The facts of this lengthy litigation have been expounded in a number of opinions by the Bankruptcy Court, the District Court, and the Third Circuit Court of Appeals.  See, e.g., Nickels Midway Pier, L.L.C. v. Wild Waves, L.L.C. (In re Nickels Midway Pier), 383 B.R. 595, 596 & n.1 (D.N.J. 2008); see also, e.g., Scottsdale Ins. Co. v. Weiner, Civil Action No. 03-3857 (D.N.J. June 17, 2009).

[3] The litigation surrounding the alleged sale of the pier is not directly at issue in or germane to this appeal.  For a more detailed account of the procedural history concerning the oral contract for sale see In re Nickels Midway Pier, 341 B.R. 486 (D.N.J. 2006), aff'd, 255 F. App'x 633 (3d Cir. 2007).

portion leased by Wild Waves.[4]  The first fire, which occurred on January 16, 2002, destroyed "Dracula's Castle" (also known as "Haunted Castle and Dungeon," or "Castle"), an amusement attraction on the pier.  As a result of these casualties, Nickels ultimately pursued claims against Wild Waves in this District, before the Honorable Jerome B. Simandle.[5]

On December 8, 2003, just days after the trial commenced in state court, Nickels initiated Chapter 11 bankruptcy proceedings in the Bankruptcy Court.  The Bankruptcy Court stayed its consideration of the lease until after the state court had reached its decision.  In early 2005, however, the Bankruptcy Court decided that until the lease and sale issues were resolved, Wild Waves would make court-determined use and occupancy payments, totaling $87,000 per year, along with a share of real estate taxes, in lieu of the amounts specified by the lease.

In May 2006, Nickels filed a motion before the Bankruptcy Court seeking to compel Wild Waves to pay the full amount of rent and real estate taxes for the pier in accordance with the

---

[4] The dates of the fires were January 16, 2002 and July 16, 2002, respectively.

[5] The litigation concerning the pier's fires originated as a subrogation action by Scottsdale Insurance Company against several defendants, including Wild Waves.  As part of that case, Wild Waves filed a third-party complaint against Nickels alleging breach of a sales contract.  In turn, Nickels counterclaimed against Wild Waves for negligence and breach of contract.  All of the parties settled their claims, except for Nickels and Wild Waves.

4

parties' lease agreement.  After several hearings, the Bankruptcy
Court, during a hearing held on January 4, 2007, held that Wild
Waves was obligated to pay rent and real estate taxes pursuant to
the parties' lease, but that the amounts due were entitled to an
abatement on account of the loss of income resulting from the
pier's fire, specifically the destruction of the Castle.  The
matter was appealed to the District Court and, subsequently, the
Third Circuit.  Both courts affirmed the Bankruptcy Court's
decision, respectively.  See Nickels Midway Pier, L.L.C. v. Wild
Waves, L.L.C., 383 B.R. 595 (D.N.J. 2008), aff'd 348 F. App'x 781
(3d Cir. 2009).

In June and September of 2007, the Bankruptcy Court
conducted hearings to consider, among other things, the parties'
cross-claims alleging breaches of the lease agreement.  On or
around September 30, 2009, the Bankruptcy Court determined that
each party breached the lease agreement, none of the breaches
were material, and the lease agreement had not been terminated
and remained executory.

Meanwhile, with respect to Nickels' action regarding the
pier's fires, Judge Simandle held a bench trial and issued an
Opinion on June 17, 2009.  For the first fire and the resultant
destruction of the Castle, the Judge found Wild Waves responsible
for 30% of the damage, leading to a judgment in Nickels' favor of
$389,182.50.  See Scottsdale Ins. Co. v. Weiner, Civil Action No.

03-3857 (D.N.J. June 17, 2009).  Judge Simandle concluded that Wild Waves' liability arose from its deactivation of the Castle's sprinkler system and smoke alarms, both of which constituted breaches of Wild Waves' duties and the lease, and enabled the fire to burn and spread, proximately causing damage to the Castle.  Id.  Wild Waves was exonerated of any liability with regard to the second fire.  Id.  Subsequently, Judge Simandle denied Nickels' motion for reconsideration of his decision.  See Scottsdale Ins. Co. v. Weiner, Civil Action No. 03-3857, 2010 U.S. Dist. LEXIS 8936 (D.N.J. Feb. 1, 2010).

Soon after Judge Simandle's decision, Nickels again moved to compel Wild Waves to pay all past rent and taxes allegedly due under the lease and to eliminate the rent and tax abatements.  On or around November 9, 2009, the Bankruptcy Court denied Nickels' motion, reiterating that Wild Waves was entitled to rent and tax abatements by virtue of the Castle's complete, unforeseen destruction and the loss of revenue that the Castle was expected to produce.  The Court entered its Order memorializing the decision on or around December 10, 2009.[6]  Nickels has appealed that Opinion and Order to this Court.

---

[6] On or around December 11, 2009, Nickels filed its Motion to Withdraw the Chapter 11 Proceeding from the Bankruptcy Court to the District Court.  This Court denied Nickels' motion.  See In re Nickels Midway Pier, Civil Action No. 09-6290, 2010 U.S. Dist. LEXIS 7366 (D.N.J. Jan. 28, 2010).

### III. DISCUSSION

#### A.   Standard of Review

On appeal, legal conclusions are subject to de novo review. In re United Healthcare Sys., 396 F.3d 247, 249 (3d Cir. 2005). Factual findings are reviewed for clear error.  Discretionary decisions are examined for abuse of that discretion.  Id.

#### B.   Rent Abatement

Nickels argues that, in light of Judge Simandle's conclusion that Wild Waves caused the fire that damaged the pier and destroyed the Castle, the Bankruptcy Court erred insofar as it continues to allow Wild Waves to pay a reduced amount of rent. According to Nickels, the parties' lease agreement, which governs the rent payments, clearly and unambiguously stipulates that in the event of a fire or casualty, Wild Waves is entitled to a rent abatement only if it did not cause the casualty.  Because Wild Waves caused the fire, at least in part, Nickels submits that Wild Waves must pay the full amount of rent -- and must repair the Castle -- and should not benefit by way of a rent abatement for its negligence.  To eliminate the abatement, Nickels explains, does not award a double recovery to Nickels because it has never received any relief for the loss of rent occasioned by the fire.

Wild Waves counters that Nickels' reliance on a particular term or condition in the lease is misguided because the contract

7

and its provisions must be interpreted contextually and comprehensively.  Wild Waves disagrees that it "caused" the fire or casualty of the Castle as contemplated by the language of the lease.  Moreover, by Wild Waves' own assessment, Nickels has failed to comply with other portions of the parties' agreement -- such as its obligations to procure liability insurance and name Wild Waves as an additional insured under the policy, and to properly utilize its proceeds from its fire insurance policy and rebuild the Castle -- thereby entitling Wild Waves to an abatement.  Additionally, Wild Waves contends that the issue of rent abatement already was addressed by the Bankruptcy Court and was affirmed on appeals to the District Court and the Third Circuit, respectively.  Lastly, to award Nickels the entire rent, opines Wild Waves, is to grant Nickels a double recovery, in combination with its insurance proceeds and the damages Wild Waves must pay as a result of Judge Simandle's decision.[7]

"The construction of the terms of a written lease is a matter of law for the courts."  <u>Barclays Bank P.C. v. 865</u>

---

[7] At the outset, the Court notes that matters pertaining to insurance and the contractual duty to rebuild or repair the Castle are not dispositive in resolving the present issue on appeal -- <u>i.e.</u>, whether Wild Waves' negligence, in accordance with the parties' intent as reflected in their lease agreement, necessitates the elimination of its rent abatement.  Moreover, those collateral matters are not squarely before this Court.  In fact, during its hearing on November 9, 2009, the Bankruptcy Court acknowledged that the issue of insurance proceeds was not before it, nor did it have any evidence relating to that issue. The same is true here on appeal.

Centennial Ave. Assocs. Ltd. P'ship, 26 F. Supp. 2d 712, 718 (D.N.J. 1998).  So too is the determination of whether a contract term is ambiguous.  Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 164 (3d Cir. 2001).  However, "[t]he interpretation of language used in a contract, that is, the determination of what ideas a contract's language induces in other persons, is a question of fact."  MLC Group v. Tenet Healthcare Corp., 68 F. App'x 322, 327 (3d Cir. 2003).

When interpreting a lease, like other contracts generally, a court is to give plain and ordinary meaning to the contractual terms, Schor v. FMS Fin. Corp., 814 A.2d 1108, 1112 (N.J. App. Div. 2002), and should not read or enforce the terms in such a way as to "write a different or better contract for the parties," Barclays Bank, 26 F. Supp. 2d at 718.[8]  Accordingly, courts will generally attempt to determine the intent of contracting parties from the contractual language itself.  Babcock & Wilcox Co. v. Kan. City S. Ry. Co., 557 F.3d 134, 143 (3d Cir. 2009) (citing

---

[8] Both parties seem to agree that New Jersey contract law applies in this matter.  In a prior appeal in this case, the Third Circuit Court of Appeals also confirmed that New Jersey law should govern the construction and interpretation of the parties' lease agreement.  See Nickels Midway Pier, 348 F. App'x at 783; see also Mayfair Supermarkets, Inc. v. Acme Markets, Inc., 1989 U.S. Dist. LEXIS 3466, at **18-19 (D.N.J. Apr. 3, 1989) ("Historically, a lease was considered a conveyance of an interest in real estate and, consequently, was interpreted under the principles of property law; however, current New Jersey law construes lease agreements under the same guidelines employed to interpret contracts.").

<u>Conway v. 287 Corp. Ctr. Assocs.</u>, 901 A.2d 341, 347 (N.J. 2006)).
However, under New Jersey law, even in the absence of any
ambiguities in the terms of a contract, a court may consider
extrinsic evidence to assist in gleaning the intent of the
parties and the import of the contract and its provisions.
<u>Conway</u>, 901 A.2d at 347; <u>see</u> <u>Nickels Midway Pier</u>, 348 F. App'x at
783 ("New Jersey lets a judge consider extrinsic evidence of the
intent of the parties even if contract language is
unambiguous."); <u>Nickels Midway Pier</u>, 383 B.R. at 600 (stating
that "under New Jersey law, a court may consider evidence of the
parties' intent whether or not an ambiguity exists on the face of
the agreement").

At the center of the parties' dispute is Paragraph 24 of the
parties' lease agreement.  Paragraph 24, entitled "FIRE AND OTHER
CASUALTY," provides:

> The Landlord shall carry Fire Insurance
> and other Property and Casualty Insurance on
> the entire premises, including the Leased
> Premises, in the amount of $5,500,000.00
> replacement policy.  Tenant shall notify the
> Landlord, at once, of any fire or other
> casualty at or on the Leased Premises.
> <u>Provided any such fire or casualty is not</u>
> <u>caused by Tenant, its employees, agents or</u>
> <u>customers, the Tenant will not be required to</u>
> <u>pay rent when the Leased Premises is unusable.</u>
> If the Tenant uses part of the Lease[d]
> Premises, the Tenant must pay rent, pro rata,
> for the usable part.  If the Leased Premises
> is partially damaged by fire or other
> casualty, the Landlord shall repair it as soon
> as possible.  This includes the damage to the
> Leased Premises and fixture installed by the

10

> Landlord.  The Landlord need not repair or
> replace anything installed by the Tenant.  .  .
> . The Lease shall end if the Leased Premises
> is totally destroyed and the Tenant has not
> chosen to replace the Leased Premises.  The
> Tenant shall pay Rent to the date of
> destruction.  If the fire or other casualty is
> caused by the act or neglect of the Tenant or
> the Tenant's employees, agents or customers,
> the Tenant shall pay for all repairs and all
> other damage.

(Nickels' Appendix ("NA"), at 124) (emphasis added).  Again,

Nickels asserts that, based on Judge Simandle's factual findings

and conclusions of law in his Opinion dated June 17, 2009, Wild

Waves was partially responsible for the fire and its negligence

was a proximate cause of the damage inflicted upon the Castle.

Therefore, a plain reading of Paragraph 24, specifically the

emphasized text (or, the "'cause' provision"), precludes any rent

abatement with respect to the unusable portions of the pier

because Wild Waves caused the fire or casualty.  In other words,

Nickels explains, to accord Wild Waves a rent abatement is to

eliminate from Paragraph 24, and render inoperative, the phrase,

"Provided any such fire or casualty is not caused by Tenant."

Notwithstanding possible ambiguities,[9] in reaching its

---

[9] The Court observes that with regard to the "cause"
provision in Paragraph 24, and in light of the facts surrounding
this case, several ambiguities may exist.  For example,
reasonable minds may differ on the meaning of "cause" in the
provision, i.e., what actions or degree of liability suffices to
demonstrate that the Tenant "caused" the fire or casualty.  Judge
Simandle concluded that Wild Waves' negligence proximately caused
about 30% of the damage to the Castle.  However, as noted in the
Bankruptcy Court's Oral Opinion dated January 4, 2007, "it is

construction and interpretation of the lease, the Bankruptcy
Court had the authority, under New Jersey law, to search beyond
the four corners of the contract and to consider extrinsic
evidence in its efforts to understand the lease agreement in
relation to the parties' intent and understanding.  See Conway,
901 A.2d at 347.  As part of its decision to deny Nickels' motion
to compel payment and eliminate the rent abatement, the
Bankruptcy Court reflected on the extrinsic evidence and the
factual findings that informed its decision to award a rent
abatement in the first place.

    At the hearing on November 9, 2009, at which it issued its
Oral Opinion, the Bankruptcy Court reiterated that the parties
quantified their rent based on the fact that the Castle was an
income-producing improvement that would generate enough money
each year to offset the annual rent.[10]  According to the Court,
the parties had not contemplated the complete destruction of the

---

undisputed that Wild Waves did not cause the fire," acknowledging
the veritable fact that two minors trespassed on the pier and
started the fire.  (NA, at 24).  Depending on the interpretation
of, and the parties' intent that animated, the "cause" provision,
a reasonable fact finder could determine that Wild Waves'
actions, though contributory to the Castle's destruction, was not
the "cause" of the fire or casualty as contemplated by the lease.

    [10] In its Oral Opinion issued on January 4, 2007, in which it
first granted Wild Waves rent abatement, the Bankruptcy Court
explained that the annual income produced by the Castle was
estimated to be about $250,000, which was intended to offset the
annual rent that also approximated $250,000.

12

Castle, and the consequent abolishment of its revenue stream.[11]
Thus, in spite of the "cause" provision in Paragraph 24 and Wild
Waves' liability, the Court found that, in accordance with the
parties' intent and understanding of the lease, the Castle's
destruction freed Wild Waves from having to pay rent predicated
on the revenue stream that the Castle was to provide.  More
specifically, the Court stated:

> [Wild Waves is] not immune from their
> conduct.  They still have to pay the rent that
> the Court ordered that they have to pay.  And
> they're also subject to damages that Judge
> Simandle awarded to [Nickels] for the damages
> that they caused.  To . . . require them to
> have to pay the full amount of the income
> producing rent, in addition to the damages
> would be a double recovery for [Nickels], in
> my estimation.  Because . . . the abatement .
> . . was entered because the property was
> changed from what was originally contemplated.
>
> The whole contemplation of what the
> parties were entering into at the time . . .
> was changed.  That was the basis for the
> abatement.  They weren't leasing the same
> thing that they were before.  They weren't
> getting the rents from the rental operating
> properties.  The . . . property wasn't the
> same.  That was the reason that the Court
> entered . . . the abatement.

(NA, at 579-80).

Later, the Court again emphasized that Wild Waves is

---

[11] Reflecting upon its prior hearings, the Bankruptcy Court
stated: "And . . . I think I found at the time that the parties
didn't really contemplate [the loss of the Castle and its
revenue].  They didn't contemplate a complete destruction of the
income producing property."  (NA, at 578).

obligated to pay rent, but that the amount must account for the
unanticipated destruction of the Castle and loss of income:

> [Paragraph 24] doesn't say that that rent
> can't be abated.  It says that they have to
> pay rent.  It doesn't say it has to be the
> rent that's set forth in the numbers that were
> calculated based on the income production.
> That was the basis for the abatement.  That
> the rent that was set forth in the contract
> was changed, not that they didn't have to pay
> rent.  I never found they didn't have to pay
> rent.  They do have to pay rent.  And . . . I
> made a determination of how to calculate that.
>
>                . . . .
>
> [A]nd nothing that . . . has happened
> since, I don't believe, in my estimation, that
> changes the ruling that the Court entered in
> 2007.

(NA, at 585).

From its Oral Opinion dated November 9, 2009, the Bankruptcy
Court appears to surmise that, given the parties' intent and
understanding surrounding the lease and the unforeseeability of
the Castle's complete destruction, the loss of revenue and income
generated from the Castle entitles Wild Waves to an abatement of
rent despite whatever damage Wild Waves may have caused to the
pier.  The Bankruptcy Court's conclusion is informed by, and
consistent with, its Oral Opinion issued on January 4, 2007,[12] in

_____

[12] Though Nickels correctly points out that its arguments in
this appeal were not decided directly and expressly as part of
the Bankruptcy Court's January 2007 Oral Opinion, in that Opinion
the Bankruptcy Court did note that Nickels "also argues that
because there are two lawsuits pending to determine whether Wild
Waves has any liability for causing the fires, that it would be

which it found that the crafting of Paragraph 24 did not
contemplate the complete destruction of the Castle and the loss
of its income -- a stream of revenue upon which Wild Waves would
rely to offset its rent.[13]  More to the point, in its January
2007 Oral Opinion, the Court explained:

> Therefore, because the complete
> destruction of the [Castle] was not
> specifically addressed by the lease in
> paragraph 24 and because the evidence is
> strong that the parties' understanding,
> including a belief that the [Castle] would
> provide income sufficient to at least offset
> the rental obligations arising under the
> lease, that . . . some abatement of the rental
> obligation is justified . . . due to the loss
> of the [Castle] as income-producing
> improvements on the leasehold, under the terms
> of the business lease.

(NA, at 28-29).

---

premature to award Wild Waves a rent abatement."  (NA, at 22).
Obviously, the Bankruptcy Court did not agree, lending support to
the notion that Wild Waves' liability, as was to be determined by
Judge Simandle, did not interfere with the propriety of a rent
abatement.

[13] Along those lines, the Bankruptcy Court, during a hearing
held on July 13, 2006, considered whether the income generated by
the Castle should affect the amount of a possible rent abatement.
In so doing, the Court noted that the Castle was part of the
"leased premises" as contemplated by the lease, but that "nowhere
in the document does the lease provide for how the parties would
be affected if the lease[d] premises were not destroyed but only
the income producing improvements [i.e., the Castle] were."  (NA,
371).
    Recalling its findings during the July 2006 hearing, the
Bankruptcy Court reiterated, on January 4, 2007, that "the lease
in paragraph 24 did not contemplate what would happen in the
event of a complete destruction of the [Castle] as income
producing improvements."  (NA, at 10).

15

Therefore, for however clear the language of Paragraph 24 may appear, the Bankruptcy Court correctly reasoned that Paragraph 24 did not contemplate the complete destruction of the Castle and the loss of its income. In addition, the Bankruptcy Court, relying on extrinsic evidence, found that the amount of rent, and the propriety of an abatement, was contingent on the revenue provided by the Castle.

Insofar as the law of the case includes the factual finding that the amount of rent owed was conditioned directly upon the Castle's generation of income and that Paragraph 24 did not contemplate the complete destruction of the Castle and the loss of its income, it is a reasonable interpretation of the contract that Nickels may not collect the full amount of rent despite Wild Waves' neglect and its proximate causation of the Castle's destruction.

The Court agrees with Nickels that, under the circumstances of this case, Wild Waves cannot forego paying rent for the pier. But, it appears that Wild Waves is paying rent for the entire pier, which it continues to occupy and utilize, including the space where the Castle existed.[14]  Wild Waves is simply not

---

[14] During its July 13, 2006 hearing, the Bankruptcy Court noted: "The lease[d] premises in question are usable. In fact, . . . Wild Waves uses the premises for a water park and it continues to occupy the entire leased premises." (NA, at 370). Moreover, in its hearing held on February 4, 2005, in which it first mandated Wild Waves to make use and occupancy payments, the Bankruptcy Court clarified:

paying rent on a revenue stream that no longer exists and is
unaddressed explicitly by Paragraph 24.

Irrespective of its negligence, Wild Waves cannot be
compelled to pay the entire annual rent without the income-
producing Castle to help offset the costs, an arrangement that
was originally intended and understood by the parties even in the
absence of explicit language to that effect.  Paragraph 24 and
the "cause" provision do not mandate the elimination of the rent
abatement here, expressly or impliedly, because those contractual
terms do not account for the destruction of the Castle and its
income.[15]  In other words, the rent abatement arises out of an

> If the position of Wild Waves is that their
> lease is not applicable, because the
> attractions no longer exist and generate
> income and the rental income should be
> determined as to ground only, the area of the
> [Castle] should be included in the fair rental
> value of that parcel of property -- utilizing
> the full size of the leased premises . . . .

(NA, at 140).

[15] Highlighting another ambiguity in Paragraph 24, the Court
notes that the "cause" provision only provides for what should
happen in the event that the tenant's actions do not cause any
damage to the leased premises; it does not expressly state what
should happen if the tenant's actions actually render the leased
premises unusable (or, for that matter, what "unusable" means in
terms of the leased premises and its income-producing
improvements).  In this sense, the "cause" provision is less
clear than another provision in Paragraph 24 which explicitly
states that, "If the fire or other casualty is caused by the act
or neglect of the Tenant . . . , the Tenant shall pay for all
repairs and all other damage."  (NA, at 125).  Accordingly,
reasonable minds may differ as to the scope and import of the
"cause" provision.  For example, the Bankruptcy Court, making a

17

event that the provisions of Paragraph 24 do not address.  That Wild Waves need not pay rent for the Castle is therefore understandable, its liability notwithstanding, because the Castle was to produce a stream of revenue that is no longer available.

Accordingly, the Court finds that the Bankruptcy Court did not clearly err when it found that Wild Waves remains entitled to a rent abatement.  Based on the Bankruptcy Court's findings and the current record, the Court also concludes that the lease agreement does not vitiate the rent abatement ordered by the Bankruptcy Court.  Therefore, the portion of the Bankruptcy Court's judgment that denied Nickels' motion to compel payments and to eliminate the rent abatement is affirmed.

### C.   Tax Abatement

Nickels also argues that the Court erred in allowing an abatement of real estate taxes because nothing in the lease provides for as much.  Paragraph 24 of the lease, says Nickels, does not mention taxes, and elsewhere in the lease, taxes and rent are defined and addressed separately.  Further, Nickels challenges the Bankruptcy Court's interpretation of "additional rent," set forth in Paragraph 12, as including property taxes and equating those taxes to rent itself.

---

similar observation with regard to its plain language, questions the inferences Nickels draws from the "cause" provision, and opined that the provision is intended to protect the tenant, as opposed to benefit the landlord.

18

Conversely, Wild Waves defends the Bankruptcy Court's
determination that, pursuant to Paragraph 12, real estate taxes
are equivalent to rent and subject to abatement.  Additionally,
Wild Waves asserts that Nickels' objection to tax abatement
already was decided by the Bankruptcy Court in a prior decision
that was later affirmed by the District Court and the Third
Circuit.  For that reason, and other equitable considerations,
Wild Waves believes the tax abatement is appropriate and the law
of the case.

In its Oral Opinion delivered on November 9, 2009, the
Bankruptcy Court explained that it had previously ruled on the
issue of taxes, and held that the taxes constitute "additional
rent" under Paragraph 12 of the lease, thereby subjecting them to
abatement same as rent.[16]

Apart from the significance of Wild Waves' comparative
liability for the destruction of the Castle, discussed supra,

---

[16] Paragraph 12 of the lease provides:

> **12.  ADDITIONAL RENT.**  If the Tenant fails to
> comply with any agreement in this Business
> Lease the Landlord may do so on behalf of the
> Tenant.  The Landlord may charge the cost to
> comply, including reasonable attorney's fees,
> to the Tenant as "additional rent."  The
> additional rent shall be due and payable as
> rent within the next rental payment.  Non-
> payment of additional rent shall give the
> Landlord the same rights against the Tenant as
> if the Tenant fails to pay the rent.

(NA, at 121).

this Court agrees with the Bankruptcy Court and Wild Waves that,
regardless of Nickels' argument, the issue of tax abatement has
already been addressed and resolved.  Throughout the litigation,
the Bankruptcy Court has treated rent and taxes similarly.  Had
Nickels disagreed with the Bankruptcy Court's judgment, it should
have raised all of its arguments previously.  In fact, in its
appeal before the Honorable Joseph E. Irenas, challenging the
Bankruptcy Court's Order dated March 6, 2007, Nickels argued that
the Bankruptcy Court improperly reduced Wild Waves' tax payments
to 19.2% of the real estate taxes on the pier, as opposed to one-
third of the overall amount.  <u>Nickels Midway Pier</u>, 383 B.R. at
602.  Citing to testimony in the record and affirming the
Bankruptcy Court's decision, Judge Irenas concluded:

> Accordingly, the record supports the
> conclusion that the parties intended the real
> estate payments to be determined in a manner
> similar to rent.  The [bankruptcy] court did
> not clearly err by interpreting the Lease to
> require reduced property tax payments upon the
> Castle's destruction.

<u>Id.</u>

This Court concurs with the reasoning set forth in Judge
Irenas' Opinion.  To the degree that the issue is properly before
this Court and not merely re-litigating a previous judgment, the
Court agrees that the Bankruptcy Court did not err by concluding
that the parties intended that the rent and real estate payments
be treated similarly, or that the lease contemplated the

abatement of tax payments in light of the Castle's destruction. Moreover, because Judge Simandle's findings of fact relating to Wild Waves' liability does not alter Wild Waves' entitlement to a rent abatement, as explained <u>supra</u>, those same findings of fact do not disrupt Wild Waves' entitlement to a tax abatement.

Therefore, for the reasons stated above, the Court affirms that portion of the Bankruptcy Court's decision.

**D.    Pre-Petition Rent**

Lastly, Nickels asserts that prior to the pier's fires, Wild Waves owed lease payments in the total, principal amount of $295,000 for the years 2001 and 2002.  In addition, Wild Waves also has not paid its rent and taxes for 2003 in the abated amount of $111,500 ($87,500 in rent and $24,000 in taxes). Therefore, with prejudgment interest, the total amount owed by Wild Waves for unpaid rent and taxes through the end of 2009 is approximately $594,007.50.  Nickels asks this Court to direct Wild Waves to pay its amount owed.

Wild Waves submits that the Bankruptcy Court is better suited, and intends, to handle these matters in a future hearing as part of a single integrated proceeding.  In particular, Wild Waves points to the Order dated November 5, 2009, in which the Bankruptcy Court states that it will address these matters relating to the parties' breaches and damages in the future.

Without any familiarity with the details or complexities of

21

these issues, and absent a particularized challenge to a specific ruling of the Bankruptcy Court before it, this Court refuses to potentially impede or encroach upon the Bankruptcy Court's decision making or resolution of this case.  Therefore, the Court will remand this particular matter to the Bankruptcy Court and leave it to that Court's judgment to adjudicate and resolve this issue in the first instance.

## IV.  CONCLUSION

     For the foregoing reasons, the Bankruptcy Court's decision to deny Nickels' motion to compel payments and to eliminate the rent and real estate tax abatements, as set forth in its Oral Opinion articulated on November 9, 2009 and in its Written Order dated December 10, 2009, is affirmed.  With respect to the total amount owed by Wild Waves to Nickels in pre-petition rent and taxes, the Court remands this matter to the Bankruptcy Court for proceedings consistent with this Opinion.  An Order consistent with this Opinion will be entered.


Dated: September 28, 2010          ___/s/ NOEL L. HILLMAN___
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.

22